Slip Op. 06 - 40

# *UNITED STATES COURT OF INTERNATIONAL TRADE*

|  |  |  |
|---|---|---|
| | : | |
| AGRO DUTCH INDUSTRIES, LTD., | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **Before: MUSGRAVE, Judge** |
| | : | Court No. 04-00493 |
| UNITED STATES, | : | |
| Defendant, | : | |
| and | : | |
| COALITION FOR FAIR MUSHROOM TRADE, | : | |
| Defendant-Intervenor. | : | |
| | : | |

[On challenge by producer/exporter to antidumping duty administrative review margin determination by U.S. Department of Commerce, matter remanded for reconsideration.]

Dated: March 28, 2006

*Garvey Schubert Barer* (*Lizbeth R. Levinson*, *Ronald M. Wisla*), for the plaintiff.

*Peter D. Keisler*, Assistant Attorney General; *David M. Cohen*, Director, *Patricia M. McCarthy*, Assistant Director, Civil Division, Commercial Litigation Branch, United States Department of Justice (*Richard Schroeder*); and Office of Chief Counsel for Import Administration, U.S. Department of Commerce (*Matthew D. Walden*), of counsel, for the defendant.

*Collier Shannon Scott, PLLC* (*Michael J. Coursey*, *Adam H. Gordon*), for the defendant-intervenor.

**OPINION**

The plaintiff Agro Dutch Industries, Ltd. brings this action to contest *Certain Preserved Mushrooms From India: Final Results of Antidumping Duty Administrative Review*, 69 Fed. Reg.

51630 (Aug. 20, 2004), *as amended* 69 Fed. Reg. 55405 (Sep. 14, 2004), the fourth administrative review since publication of the underlying antidumping duty order. *See* Pub R. 140 (unpublished), 153. Agro Dutch challenges three aspects of the determination, conducted by the U.S. Department of Commerce, International Trade Administration ("Commerce" or the "Department"): (1) the decision to treat the cost of merchandise returns to India as an indirect selling expense incurred on U.S. sales, (2) the weighted average of home market selling expenses of other respondents used as a surrogate for Agro Dutch's, which Agro Dutch contends incorporated the incorrect conclusion that commission payments from respondent Weikfield to its affiliate seller in the home market had not been at arm's length (which were thus treated not as deductible direct selling expenses but as indirect selling expenses), and (3) a finding of antidumping duty absorption. The defendant United States and the defendant-intervenor Coalition for Fair Mushroom Trade ("CFMT") oppose Agro Dutch's USCIT Rule 56.2 motion, arguing that Commerce's determination should be sustained as is. For the following reasons, the matter will be remanded to Commerce for reconsideration.

### *Jurisdiction; Standard of Review*

The Court has jurisdiction over the matter pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c). A final determination for an antidumping duty administrative review is to be upheld unless it is unsupported by substantial evidence or is otherwise not in accordance with law. *See* 19 U.S.C. § 1516a(b)(1)(B)(i).

### *Background*

Plaintiff Agro Dutch Industries, Ltd. is a producer or exporter of India of certain preserved *Agaricus bisporus* and *Agaricus bitorquis* mushrooms subject to *Notice of Amendment of Final*

*Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Certain Preserved Mushrooms From India*, 64 Fed. Reg. 8311 (Feb. 19, 1999). The contested administrative review covers the period February 1, 2002 through January 31, 2003 ("POR") and resulted in a 34.57% antidumping margin against Agro Dutch. The margin of dumping threat is the excess of normal value (the price at which the merchandise or foreign like product is sold in the foreign home market in the ordinary course of trade) over export price (the price at which the producer or exporter sells to an unaffiliated purchaser in the U.S. market) or, as appropriate, constructed export price (the price at which an affiliate of the producer or exporter sells to an unaffiliated purchaser in the U.S. market). *See generally* 19 U.S.C. §§ 1675(a)(1)(B), 1675(a)(2)(A), 1677(35)(A), 1677a(a), 1677b(a)(1)(B)&(C), 1677b(a)(4).

### *Discussion*

### I. *Movement Expense of Canceled Sales*

Commerce determined at the preliminary review that during the POR Agro Dutch had sold merchandise directly to one or more unaffiliated purchasers in the U.S. prior to importation on an FOB, C&F or CIF basis and acted as the importer of record. Because the circumstances of the U.S. sales did not otherwise indicate that a constructed export price methodology was appropriate, Commerce determined that reliance upon export price was appropriate. *Certain Preserved Mushrooms from India: Preliminary Results of Antidumping Duty Administrative Review*, 69 Fed. Reg. 10659, 10662 (Mar. 8, 2004), Pub. R. 113. *See* 19 U.S.C. §§ 1677(35)(A), 1677a(a). From the starting price, Commerce deducted foreign inland freight, freight document charges, transportation insurance, foreign brokerage and handling, Indian export duty, and international freight, and made

certain other adjustments, as required by statute.  69 Fed. Reg. at 10662.  *See* 19 U.S.C. § 1677a(c)(2); 19 C.F.R. § 351.402.

Due to insufficient Agro Dutch sales in the home market, at the preliminary review Commerce based normal value on Agro Dutch's sales to Israel, except for certain non-contemporaneous sales to the U.S. and Israel for which Commerce used constructed value (the sum of materials and fabrication, plus an amount for indirect costs such as selling, general and administrative (SGA), plus an amount for profit, plus whatever costs would be incurred to place the merchandise into *ex factory* condition, packed and ready for shipment to the United States).  69 Fed. Reg. at 10662.  *See* 19 U.S.C. § 1677b(e).  Commerce also excluded certain sales below the cost of production to Israel from Agro Dutch from the determination of normal value.  69 Fed. Reg. at 10664.  *See* 19 U.S.C. § 1677b(b)(1).  Commerce also determined that the comparisons of export price and normal value were at the same level of trade ("LOT") and therefore no LOT adjustment was necessary.  69 Fed. Reg. at 10662.  *See* 19 U.S.C. § 1677b(a)(1)(B)(i).

Certain Agro Dutch shipments deemed pertinent to the POR were discovered upon arrival in the United States to have minute traces of contaminates exceeding a U.S. Food and Drug Administration zero tolerance specification.  Accordingly, Agro Dutch canceled the sales, recalled the merchandise, and the merchandise thus never entered into U.S. commerce.  According to the record, Agro Dutch undertook recall, rather than destruction, on the expectation that it could reprocess the merchandise for resale to customers in other countries, and a majority were, in fact, sold to customers in other countries during the POR.  *Cf.*, *e.g.*, Conf. R. 50, Attachment 2 (total quantity resold).  Commerce preliminarily concluded that notwithstanding the cancellation of sales,

the movement of the merchandise to the United States was nonetheless "associated with U.S. sales" and therefore the expense of moving the merchandise to the U.S. was properly regarded as an indirect selling expense associated with U.S. sales; thus for the preliminary results, Commerce included the entire cost of moving the recalled merchandise from the U.S. to India as an indirect selling expense associated with U.S. sales but allowed a deduction for resales of the recalled merchandise to third-country customers. 69 Fed. Reg. at 10664.

The final results used the same methodology as the preliminary results except that Commerce revised its position and included all expenses related to the movement of the recalled merchandise from the U.S. to India, regardless of resale to other markets during the POR. Commerce explained that the assignment of "all such expenses to the market of the originating sale" is consistent with *Notice of Final Determination of Sales at Not Less Than Fair Value: Certain Color Television Receivers From Malaysia*, 69 Fed. Reg. 20592 (April 16, 2004) (*see* issues and decision memorandum, comment 2), that "Agro Dutch did not ship the recalled sales directly to third-country customers, but rather returned them to India to replace the merchandise in its inventory[,]" and that since "the expense is associated with selling to the United States and the original place of shipment for sales in other markets does not become the United States, we cannot assign the movement expense for the return of the goods to the third-country resales." *Issues and Decision Memorandum for Final Results of the Antidumping Duty Administrative Review on Certain Preserved Mushrooms from India* ("*I&D Memo*"), Pub. R. 141, at 4-5.

None of the parties contests the India-to-U.S. movement as indirect selling expense associated with U.S. sales: the complaint is that the U.S.-to-India movement was also treated as

"indirect selling expenses associated with U.S. sales." Agro Dutch argues that this finding is unsupported by substantial evidence on the record. It emphasizes that the reason for returning the merchandise to India, with which Commerce agreed, was to reprocess the merchandise for resale to other markets in other countries. The majority were, in fact, sold to countries other than Israel during the POR, and Agro Dutch therefore argues that the cost of moving the recalled merchandise from the U.S. to India is tied directly to the subsequent sales and is properly chargeable to such foreign market sales.

The government defends on the ground that "the associated expenses never lost their character of relating to United States sales" and therefore Commerce properly included these expenses as U.S. indirect selling expenses. Def.'s Br. at 8-11. CFMT, the petitioner at the administrative proceeding, argues that Commerce's methodology recognizes all attributes of the failed U.S. sales as U.S. expenses until such time as the goods have returned to their place of origin. Def-Int's Br. at 5-8.

As an initial observation, the Court notes that Commerce has defined "direct selling expenses" in the context of the differences in circumstances of sale regulation. They are "expenses, such as commissions, credit expenses, guarantees, and warranties, that result from, and bear a direct relationship to, the particular sale in question." 19 C.F.R. § 351.410(c). By contrast, Commerce defines "indirect selling expenses" in the context of the constructed export price offset regulation, to wit: "selling expenses, other than direct selling expenses or assumed selling expenses (*see* [19 C.F.R.] § 351.410), that the seller would incur regardless of whether particular sales were made, but that reasonably may be attributed, in whole or in part, to such sales." 19 C.F.R. § 351.412(f)(2).

More generally, with amendment of U.S. law by passage of the Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994) ("URAA"), Commerce described indirect selling expenses as

> expenses which do not meet the criteria of "resulting from and bearing a direct relationship to" the sale of the subject merchandise, do not qualify as assumptions, and are not commissions. Such expenses would be incurred by the seller regardless of whether the particular sales in question are made, *but reasonably may be attributed (at least in part) to such sales.*

H.R. Rep. No. 103-316, at 824 (Dec. 8, 1994) (Statement of Administrative Action ("SAA")),[1] *as reprinted in* 1994 U.S.C.C.A.N. 4040, 4164 (italics added).  The courts have further observed that indirect selling expenses are considered those "sales-related" expenses that do not vary with the quantity sold or are not related to a particular sale.  *E.g. SKF USA Inc. v. INA Walzlager Schaeffler KG*, 180 F.3d 1370, 1374 n.7 (Fed. Cir. 1999) (citations omitted).  They are, quite simply, a part of the cost of doing business.

In this matter, substantial evidence supports Commerce's conclusion that the movement costs, both to and from the U.S., did not encompass direct selling expenses related to U.S. sales.  The underlying U.S. sales to which they related were canceled and excluded from the dumping analysis. But that is not to imply that the movement costs *therefore* encompassed indirect selling expenses that may "reasonably be attributed (at least in part)" to the U.S. sales or that it is appropriate to include such in the dumping analysis.  In the determination of export price, in addition to the other modifications of the starting price, the only provision of apparent relevance to the immediate issue

---

[1] The SAA is "an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and [the URAA] in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d).

is 19 U.S.C. § 1677a(c)(2)(A), which requires deduction of the expenses "which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States[.]" 19 U.S.C. § 1677a(c)(2)(A). However, those expenses encompass movement expenses, not U.S. indirect selling expenses. *See NSK Ltd v. United States*, 390 F.3d 1352 (Fed. Cir. 2004) (selling expenses are not movement expenses). *Cf.* 19 U.S.C. § 1677a(d)(1)(D) (allowing for deduction of "other" selling expenses from constructed export price). In any event, the recalled merchandise was not "subject merchandise . . . *in* the United States" because it never entered the commerce of the United States.

Considering the baseline variable of the dumping equation, the calculation of normal value presents a similar conundrum to the inclusion of U.S. indirect selling expenses in the margin calculation for this matter. No relevant part of subsection (a) or (e) of 19 U.S.C. § 1677b appears to permit an adjustment to normal or constructed value for indirect selling expenses associated with U.S. selling. The selling, general and administrative expenses component of constructed value focuses on those SG&A expenses undertaken in connection with the production and sale of a "foreign like product" "in the ordinary course of trade" "for consumption in the foreign country," plus profit. *See* 19 U.S.C. § 1677b(e)(2). Although paragraph (a)(8) of section 1677b allows that constructed value "may be adjusted, as appropriate, pursuant to this subsection," subparagraph (a)(6)(B)(ii)—which describes reductions to the starting foreign market price (including, as part of the purchase price, "additional costs, charges and expenses incident to bringing the foreign like product from the original place of shipment in the exporting country to the place of delivery to the purchaser")—is not applicable to determining constructed value, which involves a build-up of the

costs involved in production and sale, plus profit, to the same or similar point in distribution that may be compared to export price as the foregoing determination of normal value.[2]  Moreover, the possible consideration of the movement costs of the canceled sales even as a matter of constructed value is made further problematic by the absence of any determination that they were properly considered "foreign like product."

Elsewhere in section 1677b, the circumstance-of-sale adjustment of subparagraph (a)(6)(C)(iii) is inapplicable because it is limited to expenses that "bear a direct relationship to[ ] the particular sale in question."  19 C.F.R. § 351.410(b).[3]  The LOT adjustment of subparagraph (a)(7)(A) offered the tantalizing possibility of explaining the inclusion of these indirect selling expenses in the margin calculation, given the fact that this review involves export price sales; however, Commerce preliminarily determined that all sales comparisons for Agro Dutch were at the same LOT, such that "an adjustment pursuant to section 773(a)(7)(A) [19 U.S.C. § 1677b(a)(7)(A)] is not warranted."[4]  In any event, these are expenses "associated with U.S. sales."  Similarly,

---

[2] In passing, it is perhaps worth noting that Commerce calculates the cost of manufacturing component of constructed value as the cost of manufacturing the U.S. subject merchandise.  *See Import Administration Policy Bulletin* 91.2 (Dep't Comm. Jul. 18, 1991).  Therefore an adjustment to constructed value "for differences in merchandise" is unnecessary when considering constructed value, according to *Antidumping Manual*, ch. 8, sec. XIII, para. B.2 (Dep't Comm. Jan. 22, 1998).

[3] The offset of 19 C.F.R. § 351.410(e) (limited to the lesser of commissions paid or U.S. indirect selling expenses, to account for commissions paid in one market but not in the comparison market) also appeared inapplicable to Agro Dutch's situation, *see* 69 Fed. Reg. at 10664 (offset applied to Premier and Weikfield), and if it were applicable, it might have been to Agro Dutch's benefit, given the magnitude of the disputed "U.S." expenses.  *See, e.g.*, Conf. R. 50, Attach. 2.

[4] 69 Fed. Reg. at 10662.  *See also* 69 Fed. Reg. 51630 (no modification of LOT determination).  Although subsection 1677b(a) does not specifically authorize a LOT adjustment to constructed value, paragraph (a)(8) states that constructed value "may be adjusted, as appropriate, pursuant to this subsection."

although the constructed export price offset provision, 19 U.S.C. § 1677b(a)(7)(B), references "indirect selling expenses" (and concerning which appears the only definition thereof in the U.S. Code), the provision is inapplicable, since this matter does not involve constructed export price. *Cf.* 19 C.F.R. § 351.412(f)(2). Lastly, the Court considered the possibility that U.S. indirect selling expenses might somehow be implicated in the allocation of profit in the constructed value determination. However, in the final results Commerce ultimately decided that all of Agro Dutch's sales to Israel were below the cost of production and it therefore relied upon the weighted average selling expenses and profit ratios derived for other respondents in deriving constructed value for Agro Dutch. *See infra.* Agro Dutch's U.S. indirect selling expenses would simply be irrelevant in that context. In short, based on the foregoing, constructed value does not appear to have provided the vehicle for considering the U.S. indirect selling expenses at issue to be part of the calculus.

If the expenses at bar are in fact indirect selling expenses associated with U.S. sales, and at this point this opinion draws no conclusions one way or the other about the matter, then the statutory and regulatory provisions do not explain their impact upon the margin for Agro Dutch, and neither do the parties. Their briefs focus on attributing these movement expenses to either the U.S. or foreign market but do not address how such expenses would enter into the dumping equation at the outset or whether that would even be proper. For example, although Commerce stated that the treatment of these movement expenses is consistent with *Certain Color Television Receivers From Malaysia*, *supra*, 69 Fed. Reg. 20592 (*see* issues and decision memorandum, comment 2), that determination involved both export price and constructed export price, whereas only the latter were adjusted for indirect selling expenses "associated with economic activities occurring in the United States." *See Notice of Negative Preliminary Determination of Sales at Less Than Fair Value,*

*Postponement of Final Determination, and Negative Preliminary Determination of Critical Circumstances: Certain Color Televisions From Malaysia*, 68 Fed. Reg. 66810, 66812-13 (Nov. 28, 2003). Also, the parties focused on disputing the implications of the returned merchandise that were addressed in *Certain Porcelain-on-Steel Cookware From Mexico: Final Results of Antidumping Duty Administrative Review*, 62 Fed. Reg. 42496 (Aug. 7, 1997), the government implying that the determination stands for the proposition that associating return freight expenses to future sales is administratively burdensome, because of the difficulty of following the expense history of various merchandise lots resold in subsequent lots, as well as distortive to U.S. price, to the extent that 19 U.S.C. § 1677a(c)(2)(A) would require freight charges for the future sales to begin at the point of shipment associated with such later sales (Def.'s Br. at 11 (referencing *id*. at 42502)), and Agro Dutch distinguishing, correctly, *Cookware From Mexico* as having involved a sale that was not canceled and arguing that any "administrative difficulty" of understanding the expense history of the recalled sales of this matter is not present in this review since Commerce was able to identify without problem that the recalled merchandise itself was in fact resold in third countries (Pl.'s Reply at 3-4). But be that as it may, the administrative record also indicates certain "awareness" that treating the expenses at issue as indirect selling expenses, however associated, would seem to obviate their inclusion in a comparison involving export price and constructed value. *Cf. I&D Memo*, Pub. R. 141, at 4 ("[CFMT] notes that, in EP comparisons, as is the case here, indirect selling expenses are not subtracted from the U.S. price, nor added to NV, nor included in the COP").

There being insufficient explanation on the record to address or explain the impact of these movement expenses of the canceled sales as U.S. indirect selling expenses on the calculation of Agro Dutch's margin, not to mention doubt as to the legality of such application, it is appropriate to

remand the matter to Commerce for reconsideration of the issue of these movement expenses, both to and from the United States, in its entirety. In doing so, Commerce shall also consider whether it is appropriate to treat the expenses as extraordinary costs or otherwise distortive to include them in the margin calculation. *Cf. Notice of Final Determination of Sales at Less Than Fair Value: Certain Preserved Mushrooms from India*, 63 Fed. Reg. 72246, 72251 (Dec. 31, 1998) ("The Department's long-standing practice with regard to 'unforeseen events' is to treat expense items as extraordinary . . . when they are both unusual in nature and infrequent in occurrence").

II. *Surrogate Home Market Selling Expenses (Commissions)*

The antidumping statute provides that the calculation of constructed value requires the inclusion of the actual amounts realized by the exporter under review for selling, general and administrative expenses in its home market, and if no actual expense data are available then it requires the inclusion of the selling expenses incurred "in connection with the production and sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise" are used, but if no such data are available then *inter alia* a weighted average of the actual selling expenses experienced by other producers or exporters in the home market under review in the same proceeding will substitute. *See* 19 U.S.C. § 1677b(e).

Agro Dutch did not incur any selling expenses in the home market. In the preliminary review, in order to achieve an appropriate comparison of export price to constructed value Commerce made a circumstance-of-sale adjustment to Agro Dutch's constructed value by deducting the weighted average direct selling expenses of Agro Dutch's above-cost sales in the third country market and adding U.S. direct selling expenses. 69 Fed. Reg. at 10665. *See* 19 U.S.C. § 1677b(a)(8); 19 C.F.R. § 351.410 (providing for circumstance of sale adjustments, pursuant to 19

U.S.C. § 1677b(a)(6)(C)(iii), "only for direct selling expenses and other assumed expenses" under subsection (b) as well as "other selling expenses" under subsection (e) to compensate for commissions paid only in one market). For the final results, Commerce determined that all of Agro Dutch's sales to Israel had been below the cost of production and it therefore relied entirely on constructed value in place of normal value. Agreeing with CFMT's argument, Commerce used the weighted average selling expenses and profit ratio derived from two other respondents, Premier and Weikfield, as the profit allocation to the constructed value for Agro Dutch. 69 Fed. Reg. at 51631. The issue here concerns Commerce's decision to treat the home market commissions paid by Weikfield to its selling-agent affiliate, WPCL, as indirect expenses rather than as direct expenses.

Commerce's practice is to treat affiliated party payments for services directly related to the sale of merchandise as commissions if the respondent can demonstrate that the payments were at arm's length. *See, e.g.*, *Ball Bearings and Parts Thereof From France, Germany, Italy, Japan, and the United Kingdom: Final Results of Antidumping Duty Administrative Reviews*, 67 Fed. Reg. 55780 (Aug. 30, 2002) (issues and decision memorandum, comment 7); *Final Determination of Sales at Less Than Fair Value: Coated Groundwood Paper from Belgium*, 56 Fed. Reg. 56359, 56362 (Nov. 4, 1991). To establish that affiliate payments are at arm's length, Commerce compares them to those paid to unaffiliated selling agents in the same market, but only if the comparison would be useful. For example, in the preceding administrative review, which was the third such review, Commerce denied Weikfield's claim that the home market commissions paid to WPCL had been at arm's length because of the difficulty of trying to equate WPCL's services to and payments by Weikfield with those provided by and to unaffiliated selling agents. *See Certain Preserved Mushrooms From India: Final Results of Antidumping Duty Administrative Review*, 68 Fed. Reg.

41303 (Jul. 11, 2003) (issues and decision memorandum, comment 4); *see also Certain Preserved Mushrooms From India: Preliminary Results of Antidumping Duty Administrative Review*, 68 Fed. Reg. 11045 (Mar. 7, 2003). *Cf. Certain Preserved Mushrooms from India: Preliminary Results of Antidumping Duty Administrative Review*, 66 Fed. Reg. 13896, 13901 (Mar. 8, 2001) (first administrative review).

In the instant review, Weikfield again asserted that the commissions paid to WPCL during the POR had been at arm's length and that its marketing and promotion activities in India would cost at least as much as if contracted by an unaffiliated company. *See* Pub. R. 98 at 28 (Dec. 23, 2003) (verification report). Commerce verified that Weikfield had in fact paid commissions to WPCL in connection with its sales activities on behalf of Weikfield and that WPCL was instrumental in establishing a market for Weikfield's products in India, *id*. at 17, but in the end Commerce agreed with CFMT that Weikfield had not established the arm's length nature of the home market commissions paid to WPCL, and it therefore declined to consider the  home-market commissions paid to WPCL as a direct deduction, instead considering the payments as indirect selling expenses. *See I&D Memo*, Pub. R. 141, at 9. The final results, incorporating by reference the unaltered preliminary determination on the issue, implied that the decision was consistent with the final results reached in the preceding administrative review. *See* 69 Fed. Reg. 51631 (referencing *I&D Memo*, Pub. R. 141); *see also* 69 Fed. Reg. at 10664. Agro Dutch argues here that this determination was arbitrary and resulted in overstated selling expenses attributed to Weikfield and assigned to Agro Dutch.

The government defends the decision to treat the commissions as indirect selling expenses as consistent with Commerce's practice, which is not to treat home market commissions paid by a

respondent to an affiliate as direct deductions unless the respondent can demonstrate that the commissions were made at arm's length. Def.'s Br. at 14. The government contends that Weikfield simply failed to demonstrate that the commissions paid to WPCL had been at arm's length. Since Weikfield did not question the decision to treat the commissions to WPCL as indirect selling expenses in its brief commenting on the preliminary results, Commerce therefore did not address the issue in greater detail in the final results, according to the government.

CFMT supports the government's position but contends as an initial matter that Agro Dutch did not raise the issue before Commerce either and therefore failed to exhaust its administrative remedies pursuant to 28 U.S.C. § 2637(d). CFMT argues that Agro Dutch, as the party in possession of its own sales and cost data, knew or should have known of the consequences of the revised data it presented to Commerce on June 2, 2004, particularly in light of CFMT's argument in its case brief that Commerce should use Weikfield's selling expenses as part of any normal value calculation. Def-Int's Br. at 10.

Pursuant to 19 C.F.R. § 351.309(c)(2), a party to the proceeding is required to present "all arguments" in its case brief that "continue in the submitter's view to be relevant" to the final results of the review. The question is whether the issue of the arm's length nature of Weikfield's commission payments to WPCL became relevant to Agro Dutch prior to conclusion of administrative case briefing. CFMT contends that it did, and that Agro Dutch knew or should have known that Commerce would rely on constructed value in the final results. CFMT contends that at verification Agro Dutch presented certain clarifications and corrections, and that

> [a]nalysis of these revised data revealed the need to rely on constructed value, a consequence of which Agro Dutch was surely aware. The consequences of Agro Dutch's data revisions were recognized by [CFMT] upon release of the

verification report and exhibits and receipt of the revised third-country sales database. They would have been no less recognizable to respondent Agro Dutch, which owned, presented and verified those same data. Yet Agro Dutch failed to take any affirmative position regarding *any* aspect of how Weikfield's or Premier's selling expenses would be imputed to its own constructed value. It then also failed to address [CFMT]'s case brief arguments on the need to use Weikfield's data for constructing normal value.

Agro Dutch's failure to raise any issue related to the treatment of Weikfield's affiliated-party commissions is particularly noteworthy because Agro Dutch had actual knowledge that Commerce would not consider Weikfield's affiliated-party commissions to be [at arm's length] . . . since the *Preliminary Results* of the review. . . .

Def-Int's Br. at 11-12 (italics in original).

Agro Dutch replies that it did not challenge the issue of the calculation of Weikfield's selling expenses after the preliminary results because it was irrelevant to its own preliminary results and therefore it had no cause or standing to brief the issue at this juncture. Pl.'s Reply at 5. Agro Dutch contends that it was not until issuance of the final results that it could complain of the implications of an administrative decision not to rely on Agro Dutch's third-country sales information and rely instead entirely on constructed value. *Id*. at 6.

As a general matter, "[t]he doctrine of exhaustion of administrative remedies provides 'that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted.'" *McKart v. United States*, 395 U.S. 185, 193 (1969) (quoting *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50-51 (1938)). If a party does not exhaust available administrative remedies, "judicial review of administrative action is inappropriate[.]" *Sharp Corp. v. United States*, 837 F.2d 1058, 1062 (Fed. Cir. 1988). When considering non-classification matters, however, there are several identified exceptions to the exhaustion requirement, including (1) the futility of raising the issue, (2) a judicial decision rendered

subsequent to the administrative determination materially impacting the issue, (3) a pure question of law, (4) the plaintiff had no reason to suspect that the agency would refuse to adhere to clearly applicable precedent. *See generally Consolidated Bearings Co. v. United States*, 25 CIT 546, 552-53, 166 F.Supp.2d 580, 586 (2001), *rev'd on other grounds*, 348 F.3d 997 (Fed. Cir. 2003). The situation here, however, is not one of these. Agro Dutch was aware that CFMT had raised the possibility that analysis of the cost of production for the sales to Israel would result in no above-cost sales, and that in that event Commerce should use the weighted average of Weikfield's and Premier's home market selling expenses and profits as part of Agro Dutch's constructed value calculation. *See* Pub R. 130 at 15 (CFMT's case brief). Further, Agro Dutch was also aware of CFMT's argument that Weikfield's commission payments to WPCL had not been at arm's length and of the record as developed with respect to that issue, including the preliminary determination to treat those commissions as indirect selling expenses rather than direct expenses. Agro Dutch did not comment on the issue by way of rebuttal before Commerce, where it might have better-preserved its interests in the arguments before Commerce that it presses here. *Cf.* Pub. R. 135 (June 24, 2004) (Agro Dutch rebuttal brief). After considering the parties' respective positions on the matter, the Court is constrained to agree that Agro Dutch has indeed failed to exhaust its administrative remedy with respect to this issue. *Accord*, *N.A.R., S.p.A. v. United States*, 14 CIT 409, 419, 741 F. Supp. 936, 944-45 (1990) (party who "was aware, or should have been aware" of action taken in preliminary determination should have raised its objection to action before final determination).

Even if there had not been a failure to exhaust administrative remedies, the final results would have to be sustained with respect to this issue. The record shows that Weikfield asserted that "contracting with an unaffiliated company to perform the same marketing and promotion activities

that WPCL has performed for WAPL [i.e., Weikfield] would probably cost at least as much as the . . . commission that WAPL pays WPCL," Pub. R. 98, *supra*, at 28, and also that Weikfield acknowledged "[c]ircumstances have not changed since the last administrative review[,]" in which Commerce found that the WPCL commissions had not been made at arm's length. Pub. R. Doc. 68 at S-10 (Aug. 19, 2003). This statement, that commissions to unaffiliated commissionaires would "probably" cost as much as those paid to WPCL, appears to be mere speculation and therefore falls short of the specific evidence required for a respondent to demonstrate that its commissions were made at arm's length. *See NTN Corp. v. United States*, 28 CIT ___, ___, 306 F. Supp. 2d 1319, 1341 (2004); *Torrington Co. v. United States*, 25 CIT 395, 436, 146 F. Supp. 2d 845, 890 (2001). Further, although Weikfield stated the WPCL plays a "distinctly different" role than the unaffiliated commissionaire in home market sales, it provided no evidence as to what the commission payments would have been for an unaffiliated commissionaire who plays a similar role as WPCL. *See* Pub. R. 98 at 28.

This was essentially the same problem that Commerce confronted in the prior review. *See* 68 Fed. Reg. 41303, *supra* (issues and decision memorandum, comment 4). Commerce determined that the evidence was insufficient to support finding Weikfield's commissions to WPCL to have been made at arm's length, and the Court finds that substantial evidence supports this conclusion. Without a proper benchmark of payment for services against which to evaluate Weikfield's payments to WPCL, it is difficult to discern how Commerce could have found otherwise. *Cf. Outukumpu Copper Rolled Products AB v. United States*, 18 CIT 204, 210-11, 850 F. Supp. 16, 22-23 (1994) (affirming finding that commissions were not made at arm's length because "Commerce was unable

to establish a benchmark against which to compare the arm's length nature of the 'commission' payments")). Therefore, the Court sustains the final results as to this issue.

III. *Duty Absorption*

Lastly, Agro Dutch complains that Commerce's decision that it absorbed antidumping duties was erroneous. *See* 19 U.S.C. § 1675(a)(4). The duty absorption provision was added by section 220(a) of the URAA, *see* 108 Stat. at 4859, and provides that Commerce shall, if requested, determine during an administrative review that is initiated two or four years after the publication of the antidumping duty order whether antidumping duties have been absorbed by a foreign producer or exporter if the subject merchandise is sold in the United States through an importer affiliated with such foreign producer or exporter, and it shall share that finding with the U.S. International Trade Commission. *Id.* The provision does not affect the calculation of the margin in the review, as it was not intended to provide for the treatment of antidumping duties as a cost; rather, a finding of duty absorption is only to be considered a "strong indicator" by Commerce of whether current dumping margins are not indicative of the margins that would exist if the order were revoked. *See* H.R. Rep. No. 103-826(I), at 60 (Oct. 3, 1994); S. Rep. No. 103-412, at 44, 50 (Nov. 22, 1994); SAA at 886, 1994 U.S.C.C.A.N. at 4210. In practice, from Commerce's perspective the duty absorption inquiry appears to involve little more than determining whether the importer is affiliated with the foreign producer/exporter and whether there is more than a *de minimis* dumping margin: if both conditions are true, the burden shifts to the respondent to prove non-absorption, *e.g.*, by producing an enforceable contract for the ultimate purchaser to pay the full duty assessed on the merchandise. *See, e.g., Fabrique de Fer de Charleroi S.A. v. United States*, 25 CIT 741, 751, 155 F. Supp. 2d 801, 812-813 (2001).

The parties do not dispute that the first two prerequisites to a duty absorption inquiry were present in this instance: CFMT requested that Commerce conduct the inquiry, *see* Pub. R. 6 (Feb. 28, 2003) (letter to Commerce from counsel for CFMT), and the administrative review was initiated four years after publication of the antidumping duty order.  For the preliminary review, Commerce determined that since Agro Dutch had acted as importer of record for nearly 80% of its U.S. sales, it was therefore "affiliated" (with itself) within the meaning of the statute, and therefore a duty absorption inquiry was required.  *See* 69 Fed. Reg. at 10661.  After receiving CFMT's request, Commerce requested evidence from Agro Dutch to demonstrate that the unaffiliated purchaser(s) will ultimately be responsible for payment of antidumping duties assessed on entries during the POR as a result of the administrative review proceeding.  Pub. R. 80 (Sep. 30, 2003) (letter from Commerce to counsel for Agro Dutch).  Agro Dutch proffered no such evidence in response, and Commerce therefore preliminarily determined that the evidence was inconclusive to establish unconditional commitment by the first unaffiliated purchaser of the subject merchandise to pay the full duty to be assessed on the subject merchandise and that Agro Dutch had therefore absorbed antidumping duties.  *See* 69 Fed. Reg. at 10661.  For support, Commerce relied on *Certain Corrosion-Resistant Carbon Steel Flat Products and Certain Cut-to-Length Carbon Steel Plate From Canada: Final Results of Antidumping Duty Administrative Reviews*, 63 Fed. Reg. 12725 (Mar. 16, 1998) (finding  that exporters who are also the importers of record are "'affiliated' within the meaning of" 19 U.S.C. § 1675(a)(4)).  *See* Pub. R. 77 (Sep. 23, 2003) (memorandum of to file).  For the final results, Commerce reiterated its determination that Agro Dutch had absorbed antidumping duties.  *See I&D Memo*, Pub. R. 141, at 7-8 (finding lack of evidence that "the unaffiliated purchaser will pay the full duty ultimately assessed on the subject merchandise").

Agro Dutch argues the standard applied by Commerce in this instance, that Agro Dutch was "affiliated" as an exporter and importer for the purpose of determining whether to conduct a duty absorption inquiry, is not in accordance with the plain language of the statute. Agro Dutch points out that all of its sales were considered export price sales and not constructed export sales, and that there was no evidence or finding by Commerce that Agro Dutch had sold subject merchandise during the POR through a related importer. Pl.'s Br. at 11 (referencing 69 Fed. Reg. 10659, Pub. R. 113). Agro Dutch further argues that even if the standard employed is in accordance with law, the record compiled in the matter does not support a finding of duty absorption because Commerce verified that the antidumping duties paid upon importation were passed along to Agro Dutch's unaffiliated purchaser and that the verified sample invoices show that the price of the merchandise charged by Agro Dutch to its customer included the payment of duties. *Id.* (referencing Conf. R., Verif. Ex. 17, Inv. ADIL/0756). Agro Dutch describes invoice 0756 as showing a price originally charged to the customer that includes the antidumping duties paid, from which are subsequently subtracted in a separate line item these same duties, since they had actually been paid by the customer directly to U.S. customs—all of which Commerce verified and which was in agreement with what Agro Dutch reported to Commerce in its sales listing.

The government's initial response is that Agro Dutch also failed to exhaust its administrative remedies with respect to this issue, specifically with respect to the argument that a basic prerequisite for finding duty absorption—separate importer and producer/exporter entities—is absent in this matter. The government construes Agro Dutch's administrative case brief as "conceding" that a duty absorption inquiry was "proper" in this instance because it only objected to the factual finding that Agro Dutch had absorbed duties and did not challenge the prerequisites to such finding. Def.'s Br.

at 25 (referencing Pub. R. 130, at 2-3 (June 10, 2004) (Agro Dutch administrative case brief)). The government argues that this matter is similar to *Ta Chen Stainless Steel Pipe, Ltd. v. United States*, 28 CIT ___, 342 F. Supp. 2d 1191 (2004) and *Heveafil Sdn. Bhd. v. United States*, 25 CIT 147 (2001) because, as in those cases, the issue was not raised in the claimant's case brief.

Once again, if a party does not exhaust available administrative remedies, "judicial review of administrative action is inappropriate[.]" *Sharp Corp.*, *supra*, 837 F.2d at 1062. One of the exceptions to the exhaustion doctrine, however, is a "pure" question of law, *i.e.*, a novel argument of a purely legal nature requiring neither further agency involvement nor further factual development or an "opening up" of the administrative record or undue delay nor expenditure of scarce time and resources. *See Consolidated Bearings*, *supra* 25 CIT at 553, 166 F. Supp. 2d at 586-87. To the extent Agro Dutch's argument implicates a pure question of law, it may be addressed here. *Cf. id.*, 348 F.3d at 1003 ("[s]tatutory construction alone is not sufficient to resolve this case" because one of cross-appellant's arguments concerned divergence from administrative practice).

The government next argues that if the issue is appropriate for consideration, then Commerce's interpretation of subsection 1675(a)(4) is reasonable because Congress failed to provide clear guidance on the issue of conducting an duty absorption inquiry when the producer or exporter is itself the importer of record, thus making the statute silent or ambiguous with respect to that issue and Commerce's interpretation thereof deserving of *Chevron* deference. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984). Applying "traditional tools of statutory construction,"[5] the government argues that it is evident from the plain text of the statute

---

[5] *Timex V.I. v. United States*, 157 F.3d 879, 882 (Fed. Cir. 1998) (quoting *Chevron*, 467 U.S. at 843 n.9).

that the relevant inquiry is whether the "foreign producer or exporter" absorbed antidumping duties

and that the "statute was written to encompass the ambiguous scenario of absorption when there is

an affiliated importer; thus, by implication it similarly encompasses the more obvious scenario of

absorption when the producer or exporter acts as importer." Def.'s Br. at 29 (referencing general

principle of statutory construction that a statute "embraces such consequential applications and

effects as are necessary, essential, natural or proper") (quoting 2B Norman J. Singer, ed., *Sutherland*

*on Statutes and Statutory Construction* § 55.036, at 285 (6th ed. 2000)).  The government thus

argues "[i]t is necessary, essential, natural or proper that [sub]section 1675(a)(4) encompass sales

through the producer or exporter itself as the importer of record."  Def.'s Br. at 29.  *Cf.* 19 U.S.C.

§ 1675(a)(4).  The government contends that examination of the legislative history supports

Commerce's conclusion that the purpose of subsection 1675(a)(4) is to provide a disincentive for

the exporter or producer to absorb antidumping duties and to pass the cost of the duties on to its

customers, which would "eliminate" the dumping.  Def.'s Br. at 29 (referencing SAA).[6]  Lastly, the

---

[6]        When an importer is affiliated with the exporter, dumping is measured by reference to the affiliated importer's resale price. However, it is the affiliated importer, not the unaffiliated U.S. purchaser of the dumped goods, who must pay the antidumping duty. Under certain circumstances, the affiliated importer may choose to pay the antidumping duty rather than eliminate the dumping, either through lowering prices in the foreign market, raising prices in the United States, or a combination of both.

SAA at 886, 1994 U.S.C.C.A.N. at 4210.  As a legal and practical matter, the responsibility for payment of antidumping duty always falls on the importer of record, regardless of affiliation.  *See* 19 U.S.C. §§ 1481, 1484, 1624; 19 C.F.R. § 141.1.  If elimination of dumping is the objective, "lowering prices in the foreign market" is beyond the ability of the importer, and thus it may be inferred that this "suggestion" was made with the foreign producer or exporter in mind.  At any rate, whether the provision was enacted with deterrence in mind,  from the perspective of either the

(continued...)

government argues that substantial evidence supports Commerce's determination because Agro

Dutch did not provide the necessary evidence to establish that the unaffiliated purchaser will pay the

full duty ultimately assessed on the merchandise, and also that the final results are consistent with

other administrative determinations that have construed subsection 1675(a)(4) as encompassing the

situation where the importer and producer/exporter are one and the same.   Def.'s Br. at 27

(referencing *Certain Hot-Rolled Carbon Steel Flat Products from the Netherlands: Preliminary*

*Results of Antidumping Duty Administrative* Review; 69 Fed. Reg. 70226 (Dec. 3, 2004); *Certain*

*Preserved Mushrooms from the People's Republic of China: Final Results of Sixth Antidumping*

*Duty New Shipper Review and Final Results and Partial Rescission of the Fourth Antidumping Duty*

*Administrative Review*, 69 Fed. Reg. 54635, 54637 (Sep. 9, 2004); *Preliminary Results of*

*Antidumping Duty Administrative Review: Stainless Steel Sheet and Strip in Coils From France*, 69

Fed. Reg. 47892 (Aug. 6, 2004); *Certain Corrosion-Resistant Carbon Steel Flat Products and*

*Certain Cut-to-Length Carbon Steel Plate from Canada: Final Results of Antidumping Duty*

*Administrative Reviews*, 63 Fed. Reg. 12725 (Mar. 16, 1998)).

The issue here turns on whether the duty absorption provision is clear or ambiguous.  Where

the meaning of the statute is clear, that is the end of the matter and a court should not examine the

legislative history to resolve the question. *Int'l Bus. Mach. Corp. v. United States*, 201 F.3d 1367,

1372 (Fed. Cir. 2000).  If the meaning is plain, it is applicable unless "it is quite impossible that

Congress could have intended the result . . . and where the alleged absurdity is so clear as to be

[6] (...continued)
importer or the foreign producer or exporter  it is difficult to discern how the uncertainty of retrospective antidumping duty assessment in the future could possibly be quantified at the present time of an importation.

obvious to most anyone." *Public Citizen v. United States Dep't of Justice*, 491 U.S. 440, 471 (1989) (Kennedy, J., concurring) (citation omitted). In this instance, although the parties apparently take the position that the conditional clause of the statute is "plain text" (*i.e.*, the operation of the statute is predicated on finding that "the subject merchandise is sold in the United States through an importer who is affiliated with such foreign producer or exporter"), the Court can not conclude that the meaning of "affiliated" is unambiguous.

On the one hand, the term is not defined either as a noun or a verb in the antidumping statute but appears only in the context of "affiliated persons," who include in relevant part "[t]wo or more persons directly or indirectly controlling, controlled by, or under common control with, any person" as well as "[a]ny person who controls any other person and such other person" among other familial and corporate relationships, and "a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person." 19 U.S.C. § 1677(33)(F)&(G).[7] Common to such definitions is the fact that an affiliated relationship involves two or more persons. *See Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1336 (Fed. Cir. 2002) ("'[a]ffiliated persons' includes any group in which one person controls another"). The statute does not reference, let alone define, a singular "affiliated person." Hence,

---

[7] The defining antidumping regulation states that "[a]ffiliated persons" and "affiliated parties" have the same meaning as in section 771(33) of the Act[,]" and in describing affiliated relationships goes on to state that "[t]he Secretary will not find that control exists . . . unless the relationship has the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product. The Secretary will consider the temporal aspect of a relationship in determining whether control exists; normally, temporary circumstances will not suffice as evidence of control." 19 C.F.R. § 351.102(b).

on the one hand, it is a stretch to interpret a single entity as being affiliated with itself, possibly precluded by operation of merger.

On the other hand, the antidumping statute more accurately describes functions, not entities. A single entity may, in fact, wear "multiple hats" in the process of manufacturing, selling and distributing merchandise. Commerce's interpretation appears less contorted when considered in such context. *Cf.*, *e.g.*, *United Dominion Industries, Inc. v. United States*, 532 U.S. 822 , 829-838 (2001) (affiliated group's product liability loss must be figured on a consolidated, single-entity basis and not by aggregating product liability losses, separately determined company by company); *N.L.R.B. v. Thalbo Corp.*, 171 F.3d 102, 114 (2nd Cir. 1999) (hotel operator and its affiliate were single entity for purposes of the National Labor Relations Act); *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71 (9th Cir. 1969), *cert. denied*, 396 U.S. 1062 (1970) (common ownership and control do not liberate corporations from the impact of the antitrust laws).

The fact that this determination involves export price and not constructed export price might appear at odds with Commerce's interpretation of subsection 1675(a)(4), *cf.* 19 U.S.C. § 1677a(a) *with* § 1677a(b), however Commerce's interpretation of subsection 1675(a)(4) appears to be a reasonable, common-sense solution to what Congress attempted to accomplish with its enactment. This conclusion is inherent from the statute's focus—upon duty absorption in the foreign producer or exporter—and therefore even if the meaning of "affiliate" were clear, and resort to legislative history unnecessary, to find that the statute does not address the circumstance of the foreign producer or exporter itself acting as the importer of record would result in an apparent absurdity.[8]

---

[8] Discussion of the appropriate level of deference to be accorded to Commerce's interpretation is therefore obviated.

*Conclusion*

For the foregoing reasons, this matter will be remanded to Commerce for reconsideration of

Agro Dutch's movement expenses associated with the recalled merchandise.


　　　　　　　　　　　　　　　　　　　　　 /s/  R. Kenton Musgrave
　　　　　　　　　　　　　　　　　　　　　 R. KENTON MUSGRAVE, JUDGE

Dated: March 28, 2006
　　　　 New York, New York